IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re<br><br>Mayslake Village - Plainfield Campus, Inc., an Illinois not-for-profit corporation,<br><br>Debtor. | Chapter 11<br><br>Case No. 09-43338<br><br>Honorable John H. Squires |

## DECLARATION OF MICHAEL A. FRIGO IN SUPPORT OF FIRST DAY MOTIONS

1)      I am the Vice-President of Mayslake Village - Plainfield Campus, Inc, an Illinois not-for-profit corporation and the above captioned Debtor.  I have served in this capacity since the Debtor was incorporated in 2002.  I am a certified public accountant with 32 years of experience, the last seventeen in the non-profit field.

2)      On today's date (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), as well as certain other motions and other pleadings (the "First Day Pleadings").  I am authorized by the Debtor to submit this Declaration on its behalf in support of the First Day Pleadings.

3)      The First Day Pleadings are intended to enable the Debtor to operate effectively and efficiently within this chapter 11 case, as well as avoid certain adverse consequences that might otherwise result from the commencement of such case.  Among other things, the First Day Pleadings seek relief aimed at maintaining vendor and supplier confidence and employee morale. Gaining and retaining the support of these key constituencies is critical to the Debtor's chapter 11 strategy and efforts.  I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to: (a) avoid additional immediate and irreparable harm to the

Debtor's business; and (b) maximize and preserve the value recoverable to stakeholders.

4)      Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Pleading.

5)      In my capacity as Vice President, I am familiar with the Debtor's day-to-day operations, financial condition, business affairs and books and records.   Except as otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents; (c) information supplied to me by other members of the Debtor's management; or (d) my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.   If I were called to testify, I could and would testify competently to the facts set forth herein.

## Part I

### Overview of the Debtor's Business

6)      The Debtor is the developer and owner of a 40 acre parcel known as Cedarlake Village, located near the intersection of Route 30 and Lockport Street in Plainfield, Illinois. Cedarlake Village is an affordable senior citizen housing development consisting of two apartment complexes containing 117 one-bedroom rental units, 69 two-bedroom rental units, 107 indoor parking spaces and 142 outdoor parking spaces.

7)      The Debtor's mission is to provide affordable housing for active seniors, in a caring environment that allows independence and dignity.   Cedarlake Village provides supportive services designed to allow seniors to avoid premature transitions to extended care environments.   Services offered include a wellness center, social services, continuing education, scheduled transportation, and a community dining hall.

8)    The Debtor is focused on serving the community of income-sensitive seniors who cannot afford the high cost of senior communities in the suburban Chicago area and who often are forced to resort to Medicare-funded nursing homes when they can no longer live with full independence.  Cedarlake Village allows these seniors the opportunity to preserve their dignity and self-sufficiency at a cost greatly below that of a for-profit senior community.

9)    The Debtor is affiliated with the Franciscan Order and is a recognized 501(c)(3) charitable organization.

10)   Because the Debtor is a recognized 501(c)(3) charity, its real estate and operations at Cedarlake Village are tax exempt.  This tax-exempt status saves the Debtor approximately $1 million annually in property and other taxes.  These savings would be lost if Cedarlake Village were sold or transferred to another entity.

## Part II

### The Debtor's Corporate Structure

11)   The Debtor is an Illinois not-for-profit corporation.  The Debtor shares several of its officers and directors and its charitable mission with several other Illinois not-for-profit corporations, including Franciscan Tertiary Province of the Sacred Heart, Inc. and MV Benevolent Fund, Inc.  Nevertheless, Franciscan Tertiary Province of the Sacred Heart and MV Benevolent Fund are fully separate legal entities.

## Part III

### Events Leading to the Commencement of this Case and the Debtor's Strategies

*The Construction Loan and the Residential Real Estate Market*

12)   Acquisition and construction of Cedarlake Village was financed in 2005 with a

Declaration in Support of First Day Motions
71228-0001.0001/LEGAL16977795.1                    -3-

land loan and a construction loan from LaSalle Bank N.A. in the aggregate amount of $27,044,000.00 (collectively, the "Loan"). Both loans fully matured on August 1, 2008. To secure its obligations from the Debtor, LaSalle took a Construction Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated August 4, 2005 on the Cedarlake Village property.

13)      Contemporaneously with the Cedarlake Village Loans, another Franciscan entity, MV Benevolent Fund, refinanced a $4,130,000.00 loan secured by the Equity in certain investment accounts maintained by MV Benevolent Fund. This loan served to fulfill the equity requirement for the Construction and Land Loan from LaSalle to the Debtor. As of the time of this filing, this Loan has been fully discharged.

14)      One final $1,725,000.00 line of credit was issued by LaSalle Bank N.A. to the Debtor to finance the last state of construction of Cedarlake Village. This line of credit was secured by a mortgage on a property known as Cloister Courts owned by the Franciscan Tertiary Province of the Sacred Heart. As of the August 2, 2008 maturity date, the Debtor had drawn $1,475,000.00 on the line of credit. After the maturity date, the full balance of the line of credit was due, which the Debtor could not pay. A different division of Bank of America handled that loan and, upon negotiation, agreed to forbear from its Default remedies through December 31, 2009, if the Franciscan Tertiary Province of the Sacred Heart assumed the obligation. The Franciscan Tertiary Province of the Sacred Heart agreed and the Debtor agreed to repay the $1,475,000.00 to that entity.

15)      The Debtor made all required payments on its Loan through June 30, 2008, and continued to make interest payments at the maximum level it could afford until August 1, 2009,

when Bank of America filed an action to foreclose upon its Mortgage.  The Debtor has, since the maturity date, paid $527,000 in partial interest payments on its obligation.  However, the Debtor is unable to pay the matured balance of the loan and as of June 25, 2009 owed $27,456,556.19 in unpaid principal and interest on the obligation.

16)   It was the Debtor's intention to refinance the construction and land loan prior to the maturity date by issuing tax-exempt bonds.  However, given the worldwide economic crisis and the resultant credit freeze, the Debtor has been unable to issue bonds or secure take out financing on the open market.

17)   Because of its inability to secure refinancing, the Debtor has repeatedly attempted to work with its current lender, Bank of America (the successor-in-interest to LaSalle Bank), to restructure its current debt.  Bank of America has responded to the Debtor's overtures by setting unrealistic goals for leasing rates and demanding an escrowed deed-in-lieu of foreclosure tied to the Debtor's achievement of these benchmarks.  The Debtor's third-party consultant has opined that the Debtor is extremely unlikely to lease its property at the rate required by Bank of America, and would almost certainly be forced to turn over the property via the deed-in-lieu.

18)   The current real estate market has hindered the Debtor's efforts to increase its rental base and slowed its rate of occupancy.  Given the downturn in residential sales, many seniors have not been able to sell their existing homes or have decided to delay placing their homes on the market.  The Debtor's target renter simply cannot afford to pay both a mortgage and a rental payment.  While the Debtor's third-party consultants expect the current improvement in the economic situation to positively impact its leasing rates over the next few years, the Debtor expects a gradual improvement in occupancy rates and not the precipitous increase

demanded by Bank of America in its refinancing negotiations.

19)    The property is currently 40% occupied; with only minor increases in its residency rate, the Debtor would be able to make payments on the Loan at the regular rate listed in the Loan Documents.   The Debtor, however, is unlikely to be able to make Default Interest payments.

20)    Further, Bank of America refused to allow Debtor to sell a potion of its property so that the Purchaser could construct a managed care facility.   This sale would have allowed Debtor to make increased payments of interest to Bank of America and would have also supported the Debtor's mission of providing care to seniors of limited means.   The proposed purchase price was approximately $700,000.

21)    The Debtor has been and continues to be open to any reasonable refinancing option proposed by Bank of America.   Despite this, willingness to reach a mutually beneficial solution, Bank of America has filed to foreclose on the property.

22)    If successful, this foreclosure action would void the tax-exempt status of the property and severely diminish the property's value.   Without the Debtor's tax-exempt status, the property would be assessed over $670,000 of property tax annually.   Given the current state of the real estate market, the Debtor believes that imposition of this tax liability would reduce the property's value by more than $10 million dollars.

23)    In fact, the Debtor is informed and believes that Bank of America's own appraisals indicate that it is significantly undersecured.   This undersecuritization would only be exacerbated by the loss of the Debtor's tax-exempt status.

Declaration in Support of First Day Motions
71228-0001.0001/LEGAL16977795.1                    -6-

24)   Further, the Debtor believes that its mission of aiding income-sensitive seniors would be severely compromised, if not destroyed, by the repurposing of Cedarlake Village as a for-profit facility.  The Debtor is committed to providing services and support for its elderly residents, and residents of the surrounding community, at cost.  The Debtor believe that any for-profit purchaser, whether the bank or a third-party, would need to raise rents and the cost of services, harming the residents of Cedarlake Village and severely undermining the Debtor's charitable works.

*Strategies for this Chapter 11*

25)   The Debtor believes that, if it is given the time to ride out the current poor economic climate, it will be able to both meet its occupancy goals and to pay its obligations to the Bank and other creditors.  Reorganizing in chapter 11 will allow it to establish a multiple year plan under which it will, ultimately, pay all of its creditors in full and maintain both its tax-exempt status and its mission of serving income-sensitive seniors.

26)   The Debtor intends to propose a plan which will extend the maturity date of the Loan, so that over time the Debtor will pay Bank of America the full principal amount of the loan along with non-Default Rate interest.

**Part IV**

**Facts relevant to the First Day Pleadings**

27)   Concurrently with the filing of this chapter 11 case, the Debtor filed the First Day Pleadings requesting various forms of relief.  Generally the First Day Pleadings have been designed to meet the Debtor's goals of: (a) continuing its operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of its employees, vendors, supplier and service providers during the Debtor's chapter 11 case; and (c)

Declaration in Support of First Day Motions

71228-0001.0001/LEGAL16977795.1                              -7-

establishing procedure for the smooth and efficient administration of this chapter 11 case.

28)    I have reviewed each of the First Day Pleadings filed contemporaneously herewith (including the exhibits and supporting memoranda), and incorporate by reference the factual statements set forth in the First Day Pleadings.  It is my belief that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to succeed in its chapter 11 strategy.

*Debtor's Motion for Interim and Final Orders (A) Authorizing Debtor to Use Cash Collateral and Other Collateral and Granting Adequate Protection Pursuant to Sections 361, 362 and 363 of the Bankruptcy Code, and (B) to Schedule a Final Hearing (the "Cash Collateral Motion")*

29)    To sustain Cedarlake Village as a going concern during the course of its chapter 11 case, the Debtor must be able to utilize the rental income it receives from Cedarlake Village (as defined in more detail in the Cash Collateral Motion, the "Cash Collateral").  Without the ongoing use of the Cash Collateral, the Debtor would not have sufficient available working capital to finance its ongoing post-petition business operations until it confirms a plan of reorganization.  I believe that use of the Cash Collateral will allow the Debtor to operate as a going concern until it confirms its plan of reorganization, which will maximize the value of the Debtor's bankruptcy estate.  In the absence of immediate authorization of the use of the Cash Collateral, the Debtor could not continue to operate its business, and will incur immediate and irreparable harm to its assets, its creditors and devalue its bankruptcy estate.

30)    The Debtor requires use of the Cash Collateral to operate its business and to pay vendors, Manager, taxes, insurance, and bankruptcy-related expenses, so that the Hotel can continue to generate revenue and maintain its value.  The Debtor intends to use the Cash Collateral pursuant to the Budget attached to the Interim Cash Collateral Motion as Exhibit 1 and

attached to this Declaration as <u>Exhibit A</u>.

31)    In connection with its use of the Cash Collateral, the Debtor is not providing Bank

of America ("Lender") with any additional liens.

*Debtor's Motion for (I) Authorization of Continued Use and Maintenance of Existing Bank Accounts and Existing Business Forms and (II) Waiver of Investment and Deposit Requirements under 11 U.S.C. § 345 (the "Bank Account Motion")*

32)    The Debtor maintains five bank accounts. The Debtor's cash and check receipts

are deposited into one of two operating accounts the first account is maintained at Bank of

America and the second account is maintained at Harris Bank (the "Operating Accounts"). All

operating expenses are paid out of these accounts. The Debtor also maintains two separate

security deposit account at Bank of America, as required by law (the "Security Deposit

Accounts"). One of these Security Deposit Accounts is a certificate of deposit account. These

interest-bearing accounts hold all security deposits paid by residents at Cedarlake Village. The

Debtor also maintains an insurance reserve account at Bank of America (the "Insurance Reserve

Account"). This account is used solely to fund insurance premiums. By its Bank Account

Motion, the Debtor requests that this Court authorize it to continue to maintain and use the Bank

Accounts during this bankruptcy case.

33)    The following is a summary of the Bank Accounts:

| Bank | Account Owner | Account Number | Account Purpose |
|---|---|---|---|
| Bank of America | Debtor | 5201454112 | Rents and other income; operating expenses |
| Harris Bank | Debtor | 4803511330 | Rents and other income; operating expenses |
| Bank of America | Debtor | 5201453642 | Insurance Reserve account |

| Bank of America | Debtor | 5201453642 | Security Deposit Account |
| Bank of America | Debtor | 10074806294965 | Security Deposit CD Account |

34)     The Debtor's transition into chapter 11 will be greatly enhanced by its ability to maintain its Bank Accounts without interruption.  In addition, given that the goal of this case is a reorganization, it would be impractical and inefficient for the Debtor to implement new accounts. The Bank Accounts include the necessary accounting controls to enable the Debtor to trace funds and ensure that all transactions are adequately documented and readily ascertainable.  The Debtor will continue to maintain records reflecting all transfers of funds.

35)     Indeed, the operation of the Debtor's business requires continuation of the Bank Accounts during this chapter 11 case.  Opening new bank accounts would be expensive, would create unnecessary administrative burdens and would be disruptive to the Debtor's business operations, especially given the Debtor's intention to reorganize.

36)     If the requested relief is granted, the Debtor will not pay, and the Banks will be directed not to pay, any debts incurred by the Debtor before the Petition Date other than as authorized by the Court.  The Debtor will work closely with the Banks to ensure that appropriate procedures are in place so that checks issued before the Petition Date on account of obligations of the Debtor, but presented after the Petition Date, will not be honored absent approval from this Court.

37)     For the same reasons, and in order to minimize expenses, the Debtor also requests that the Court authorize it to continue to use all correspondence, business forms (including, but not limited to, letterheads, purchase orders and invoices) and checks existing immediately before

Declaration in Support of First Day Motions

71228-0001.0001/LEGAL16977795.1                                -10-

the Petition Date without reference to the Debtor's status as a debtor in possession.

38)     I believe that parties doing business with the Debtor undoubtedly will be aware of

its status as a debtor in possession as a result of the notice of this case provided to virtually all of

the Debtor's creditors.  Requiring the Debtor change its business forms would be expensive and

burdensome to the Debtor's estate and extremely disruptive to the Debtor's operations.  The

costs and potential disruption are not justified given the fact that the Debtor anticipates

confirming a plan of reorganization within a relatively short period of time.

*Debtor's Motion for an Order (I) Prohibiting Utility Companies From Altering, Refusing
or Discontinuing Services and (II) Deeming the Utility Companies Adequately Assured of
Payment*

39)     In connection with the operation of its business, the Debtor obtains service from

approximately five different utilities (the "Utilities") for, among other things, water, sewage,

natural gas, electricity and telecommunications (collectively, the "Utility Services"), and spends

approximately $16,000 per month on utility costs.

40)     Uninterrupted Utility Service is critical to the Debtor's ability to maintain its

business as a going concern.  Should the Utilities refuse or discontinue service, even for a brief

period, the Debtor's operations would be severely disrupted, seriously harming the Debtor's

senior residents.  It is, therefore, critical that utility service continue uninterrupted.

41)     Although I anticipate that cash flow from ongoing operations will be sufficient to

allow it to satisfy all administrative expenses, including post-petition utility bills, on a current

basis, the Debtor further proposes to adequately assure the Utility Companies by prepaying for

post-petition Utility Services.

Declaration in Support of First Day Motions

71228-0001.0001/LEGAL16977795.1                    -11-

## Conclusion

42)     The Debtor's ultimate goal is to confirm a plan of reorganization.  In the near

term, however, the Debtor's immediate objective is to maintain the value of its business and a

business-as-usual atmosphere during the pendency of its chapter 11 case, with as little

interruption or disruption as possible.  I believe that if the Court grants the relief requested in the

First Day Motions, the Debtor's prospect for achieving these objectives will be substantially

enhanced.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 16 2009.          Respectfully submitted,

MAYSLAKE VILLAGE – PLAINFIELD
CAMPUS, INC.

By: _____
        Michael A. Frigo
        Vice President

Subscribed and sworn to me this
16th day of November, 2009

_____
Notary Public

My commission expires: 02/02/13

```
♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦
♦          "OFFICIAL SEAL"          ♦
♦       TERESA M. ALBERTINO       ♦
♦    Notary Public, State of Illinois    ♦
♦ My Commission Expires 02/02/13 ♦
♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦
```

# EXHIBIT A

**Cedarlake Village**
**5 Week Cash Flow Budget**

| Week Beginning: | 11/16/2009 | 11/23/2009 | 11/30/2009 | 12/7/2009 | 12/14/2009 |
|---|---|---|---|---|---|
| Beginning Cash Balance | 201,731 | 207,824 | 166,719 | 166,719 | 143,407 |
| Projected Income | 49,814 | - | - | 28,659 | 100,163 |

**Expense:**

| | | | | | |
|---|---|---|---|---|---|
| 62040 · Professional Fees | - | - | - | - | - |
| 62100 · Advertising/Marketing | 20,000 | - | - | 20,000 | - |
| 63100 · Office Salaries | - | 125 | - | 125 | - |
| 63110 · Office Expenses | - | 5,500 | - | 2,750 | - |
| 63400 · Legal Expenses | - | - | - | - | - |
| 63500 · Auditing Expenses | - | - | - | - | - |
| 63510 · Bookkeeping/ Acctg Service | 950 | - | - | 850 | - |
| 64500 · Electricity | - | 8,370 | - | - | 8,370 |
| 64510 · Water | - | 4,710 | - | - | 4,710 |
| 64520 · Gas | - | 3,500 | - | - | 3,500 |
| 64540 · Licenses & Permits | - | - | - | - | - |
| 65150 · Supplies (Repair & Maint) | - | 750 | - | - | 750 |
| 65175 · Repair & Maintenance | - | 10,500 | - | - | 10,500 |
| 65176 · Outside Cleaning Service | 1,300 | - | - | 1,300 | - |
| 65250 · Garbage & Trash Removal | 175 | - | - | 175 | - |
| 65300 · Security Contract | 3,662 | 4,250 | - | 8,500 | - |
| 67200 · Property & Liab. Ins | 6,000 | - | - | 6,000 | - |
| 68200 · Interest Expense | 6,135 | - | - | 6,770 | - |
| 69700 · Activities Salaries | - | 850 | - | - | 850 |
| 69750 · Misc Activities Expenses | - | 350 | - | - | 350 |
| 69910 · Food Service Costs | 4,500 | - | - | 4,500 | - |
| 69915 · Food Service Salaries | - | 2,200 | - | - | 2,200 |
| 69925 · Transportation Expense | 1,000 | - | - | 1,000 | - |
| **Total Expense** | 43,722 | 41,105 | - | 51,970 | 31,230 |
| **Net Cash Flow** | 6,092 | (41,105) | - | (23,311) | 68,933 |
| Ending Cash Balance | 207,824 | 166,719 | 166,719 | 143,407 | 212,340 |