**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: | ) Bankruptcy No. 09 B 43338 |
| | ) Chapter 11 |
| MAYSLAKE VILLAGE–PLAINFIELD | ) Judge John H. Squires |
| CAMPUS, INC., an Illinois not-for-profit | ) |
| corporation, | ) |
| | ) |
| Debtor. | ) |

**MEMORANDUM OPINION**

These matters come before the Court on confirmation of the Chapter 11 plan of reorganization (the "Plan") filed by Mayslake Village–Plainfield Campus, Inc. (the "Debtor") and the objections thereto filed by Bank of America, N.A. (the "Lender"), as well as on the Lender's motion for relief from the automatic stay under 11 U.S.C. § § 362(d)(2) and (d)(3) and the Debtor's response in opposition. For the reasons set forth herein, the Court sustains in part the Lender's objections and denies confirmation of the Plan. Further, the Court grants the Lender's motion for relief from the automatic stay under § § 362(d)(2) and (d)(3)(B).

**I. JURISDICTION AND PROCEDURE**

The Court has jurisdiction to entertain these matters pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. They are core proceedings under 28 U.S.C. § 157(b)(2)(G) and (L).

-2-

## II. FACTS AND BACKGROUND

The parties stipulated to the following facts.  The Debtor is an Illinois not-for-profit corporation that owns real estate in Plainfield, Illinois, improved with a 186-unit senior housing facility, known as Cedarlake Village (the "Property"), that provides moderate-cost housing for lower income senior citizens.  The Debtor is a tax exempt entity under I.R.C. § 501(c)(3) and also is exempt from sales tax as an Illinois charitable organization.  The Debtor obtained a property tax exemption pursuant to 35 ILCS 200/8-35, 16-70, and 16-130 (2008).  Thus, the Property is not subject to Illinois real estate taxes.

The improvements made to the forty-acre site were completed in 2006 when the facility opened for resident tenants.  It is undisputed that the improvements include dwelling units with meal service, a wellness center, a library, a store, chapel services, scheduled transportation, and home health care services, among other support services and amenities.  The Property site includes approximately twenty acres of vacant land that can be sold separately.

The acquisition and construction of the Property were financed by the predecessor of the Lender, and the debts were evidenced by two notes executed by the Debtor: the Project Promissory Note in the original principal amount of $25,500,000 and the Land Promissory Note in the original principal amount of $1,544,000 (collectively, the "Construction Notes").  For purposes of the matters at bar, the Debtor owes the Lender $30,129,134 on the Construction Notes.  Although the parties do not stipulate as to the value of the Property, they stipulate that the value is less than the amount of the Lender's claims against the Debtor.  The Construction Notes, which matured on August 1, 2008, are unpaid and secured by both a senior mortgage and an assignment of leases and rents on all of the Debtor's interest in the Property.

-3-

The Construction Notes are guaranteed by the limited guaranty of payment (the "Guaranty") by the Franciscan Tertiary Province of the Sacred Heart, Inc. (the "Affiliate"), a corporate entity related to the Debtor. The Affiliate's Guaranty is secured by a junior mortgage, a security agreement, an assignment of leases and rents, and a fixture filing in favor of the Lender on real property owned by the Affiliate known as Cloister Courts, which is located in Oakbrook, Illinois. The Affiliate executed two notes (on which the Debtor is not liable to the Lender) in favor of the Lender: (1) a line of credit obligation in the principal amount of $1,725,000 on which advances were made totaling $1,543,884 for the completion of the improvements to the Property (the "Completion Line of Credit"), and (2) a mortgage note in the principal amount of $1,819,649.82 secured by a senior mortgage on Cloister Courts. The Lender and the Affiliate entered into a forbearance agreement that combined these two notes into one note with a pre-petition balance of $3,240,964.75 for which the Affiliate is directly liable to the Lender.

On July 31, 2009, the Lender filed a foreclosure action with respect to the Property against the Debtor and other entities. On November 16, 2009, the Debtor filed a Chapter 11 bankruptcy petition. Both before and after the filing of the petition, the Debtor has provided monthly profit and loss statements and monthly rent rolls to the Lender. During the period June 1, 2009 to August 31, 2010, occupancy at the Property increased from 66 to 79 units, with an ending occupancy lease rate of 42%. As of August 31, 2010, the Debtor held in its operating accounts $322,714.25 in excess cash generated from post-petition rents, as well as $204,466.51 that was collected pre-petition.

The following additional facts were adduced from the testimony and documentary evidence admitted at trial. On February 16, 2010, the Debtor filed the Plan and subsequently filed

-4-

an amended disclosure statement (the "Amended Disclosure Statement"). (Lender Ex. Nos. 1 &

2.) The Plan and Amended Disclosure Statement provide for the Debtor to continue to own and

operate the Property as a residential rental facility for senior citizens and to retain its real estate

and sales tax exemptions. The Lender made its election, pursuant to 11 U.S.C. § 1111(b), to have

its under-secured claim treated as if it was fully secured. All of the voting creditors, except the

Lender, voted to accept the Plan. At trial, the uncontested testimony indicated that the value of

the Property was $8.9 million if operated by a for-profit entity and $13.4 million if operated by

a not-for-profit entity. (Lender Ex. No. 24.) The Debtor has no equity in the Property for

purposes of 11 U.S.C. § 362(d)(2)(A) and the motion for relief from the stay.

      The Plan provides that all allowed claims are to be paid in full, with unsecured claims to

be paid from unencumbered cash in five monthly installments beginning upon the effective date

of the Plan after confirmation. The Lender's claims against the Debtor are arranged in two classes

and are to be paid in full from the net earnings of the Debtor from the Property over a term no

longer than twenty-five years. The first claim (Class 2) totals $27,003,000 and represents the

unpaid principal owed on the Construction Notes. The second claim (Class 3) is for $3,160,791

in unpaid pre-petition accrued interest on those Notes. The monthly Plan payments to the Lender

are based on an annual interest rate of 3.25% on the Class 2 claim and are to commence in

January 2013 through the maturity date of December 31, 2035. The Plan also provides for

payment to the Lender for a claim owed by the Affiliate to the Lender for the Completion Line

of Credit (Class 7). That claim is to be paid in the principal amount of $1,523,893 plus interest

at an annual rate of 5.0%. (The Affiliate filed a $1,543,884 unsecured claim in this case. (Lender

Ex. No. 31.))

-5-

Under the Plan, claims are to be paid in the following order: (1) all current interest on the Class 7 claim (the current monthly interest accruing on the Completion Line of Credit); (2) all current interest on the Class 2 claim (the current monthly interest accruing on the Construction Notes); (3) all unpaid Class 2 accrued interest (the accrued interest on the Construction Notes); (4) the Class 3 claim (the pre-petition accrued interest on the Construction Notes); (5) the Class 7 principal claim (the outstanding principal of the Completion Line of Credit); and (6) the Class 2 principal claim (the outstanding principal amount of the Construction Notes).

Based on the projections in the Plan and Amended Disclosure Statement, the Debtor contends that full monthly interest payments to the Lender must begin by January 10, 2013 and that such payments can be made when the Debtor has increased tenant occupancy in the Property to 107 tenants (from the present tenant level of 79). The Class 3 claim is to be paid commencing January 10, 2015, with payment in full by December 31, 2020, at which time the Plan projects that all post-petition accrued interest will have been paid. The Debtor must begin paying principal on the Class 2 claim by December 21, 2020, by which time the Class 3 and Class 7 claims will have been paid in full, with the projection estimates that these payments will begin in 2018. Moreover, the Plan requires a balloon payment in full of the Lender's claims by either December 31, 2035 or within six months of the amount outstanding being reduced to $12 million, which the Debtor's projections estimate will be no later than 2030. According to the projections, the Debtor will pay a total of $46,990,583 over a twenty-year period to the Lender. In addition, the Plan provides for the subordination of the Guaranty secured by the junior mortgage on Cloister Courts and the release of the senior mortgage on that property to the extent that it secures the Completion Line

-6-

of Credit. Lastly, the Plan contains certain injunctive and release provisions in favor of the Affiliate and related charitable entities.

The primary disputes with respect to the Plan are the treatment of the Lender's claims and the payment of a claim not owed by the Debtor to the Lender, but one that the Affiliate owes to the Lender, which, in turn, the Debtor owes to the Affiliate for the Completion Line of Credit. The Lender objects to the Plan on several grounds: (1) the projected payments do not provide the Lender with a present value that is greater than or equal to the present value of the Property as required by 11 U.S.C. § 1129(b)(2)(A)(i)(II); (2) the treatment of the Lender's claims is not "fair and equitable" under 11 U.S.C. §§ 1129(b)(1) and (b)(2)(A); and (3) the Plan is not feasible under 11 U.S.C. § 1129(a)(11).

Specifically, the Lender contends that the proposed payments on the Class 2 and Class 3 claims total only $20,184,743, which is less than the amount of the Class 2 claim as of the commencement of this bankruptcy case ($27,003,000 x .0325 x 23 years = $20,184,742.50). Based on the opinion of one of its experts, the Lender argues that the appropriate annual discount rate to apply to the payments that the Debtor is to make under the Plan should be no less than 13.75%, or 1.145% per month. Using that rate, the proposed payments under the Plan would have a net present value of between $5,885,288.90 and $6,196,543.29. Alternatively, using a discount rate of 10%, or 0.8333% per month, the net present value of the proposed payments under the Plan would be between $9,234,123.10 and $9,548,593.35. In any case, whichever discount rate is used, the Lender contends that the present value of the proposed payments for the Class 2 and Class 3 claims is less than the current value of the Lender's interest in the Property. The Debtor counters that the net present value of the annualized projected payments at a 10% discount rate

-7-

is $15,652,680, which exceeds the Lender's interest in the Property at its claimed value of $13.4 million. Therefore, the Debtor argues, the § 1129(b)(2)(A)(i)(II) test has been satisfied.

The Lender further contends that the Debtor's projected increase in revenues and decrease in expenses are unlikely to be achieved and are unreasonable in light of the Debtor's actual financial performance in the past years. Moreover, according to the Lender, the projections inadequately provide for reserves for likely needed repairs and capital expenditures for the Property over the life of the Plan.

The Lender also strongly objects to the preferred treatment and payment of the Class 7 claim ahead of its claims. According to the Lender, the payment of the Class 7 claim effectively subordinates its Class 2 and Class 3 claims to the unsecured claim of the Affiliate. The Class 7 claim is to be paid with post-petition net rents from the Property, which are part of the cash collateral of the Lender under 11 U.S.C. § 552(a). Thus, the Lender argues that the Plan violates the fair and equitable treatment required under §§ 1129(b)(1) and (b)(2)(A).

Additionally, because the Plan allows the Debtor to sell undeveloped portions of the Property without the Lender's consent, the Lender maintains that the Plan effectively deprives it of its right to credit bid under 11 U.S.C. § 363(k). Further, the Plan enjoins the Lender, under certain circumstances, from exercising its rights against the Affiliate and its property,[1] and there

---

[1]  Article IX(B) of the Plan states as follows:

> Upon Confirmation, [the Lender] shall be enjoined from engaging in any litigation or collection efforts against the Franciscan Charitable Entities in any action arising from or relating to in any manner to the Guaranty, the Completion Line of Credit, the Combined Note, the Cloister Court[s] Mortgage, the Cloister Courts Guaranty Mortgage or the loan or other documents related thereto, in state or federal court or

-8-

is no evidence to show that the Affiliate made any substantial contribution to the reorganization

of the Debtor or that any release of the Affiliate is essential to the Debtor's reorganization.

The Lender also filed a motion for relief from the automatic stay pursuant to 11 U.S.C.

§§ 362(d)(2) and (d)(3) in order to allow the Lender to proceed with the mortgage foreclosure

action against the Property. The Lender seeks such relief for the following reasons: (1) the Plan

lacks a realistic possibility of being confirmed; (2) the case meets the definition of the term

"single asset real estate" for purposes of 11 U.S.C. § 101(51B); and (3) the Debtor has not

commenced any monthly interest payments as required by § 362(d)(3).


## III. DISCUSSION

### A.   Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the substantive requirements for

confirmation of a Chapter 11 plan.  In order to be confirmed, a plan must satisfy §§ 1129(a)(1)-

(16).  *See In re 203 N. LaSalle St. P'ship*, 126 F.3d 955, 960 (7th Cir. 1997), *rev'd on other*

*grounds*, 526 U.S. 434 (1999).  A plan that satisfies every part of § 1129(a), except for subsection

(a)(8), may be confirmed by "cram down" under § 1129(b) if the plan does not discriminate

unfairly between impaired classes and is fair and equitable to the rejecting classes.  *Id.* at 961; *In*

*re S. Beach Sec., Inc.*, 376 B.R. 881, 887 n.11 (Bankr. N.D. Ill. 2007); *In re Rusty Jones, Inc.*, 110

B.R. 362, 373 (Bankr. N.D. Ill. 1990).

---

in any other forum, or taking any other actions whatsoever to
obtain possession or control of the assets of the Franciscan
Charitable Entities. . . .

(Lender Ex. No. 1.)

Case 09-43338   Doc 179   Filed 12/07/10   Entered 12/07/10 09:13:21   Desc Main
Document    Page 9 of 25

-9-

The proponent of the plan bears the burden of establishing that each requirement set forth in § 1129(a) has been met. *In re Vita Corp.*, 358 B.R. 749, 750 (Bankr. C.D. Ill. 2007), *aff'd*, 380 B.R. 525 (C.D. Ill. 2008). The proponent has the burden of proving by a preponderance of the evidence that the plan complies with those requirements. *S. Beach Sec.*, 376 B.R. at 887; *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005), *aff'd*, No. 05 C 7075, 2008 WL 4379035 (N.D. Ill. Mar. 24, 2008); *Rusty Jones*, 110 B.R. at 373. Even absent the filing of an objection to a plan, the proponent must affirmatively demonstrate that the plan is confirmable. *Rusty Jones*, 110 B.R. at 373. In addition, regardless of whether an objection to confirmation has been asserted, the court must determine whether the requirements of § 1129(a), and if applicable § 1129(b), have been met. *Vita Corp.*, 358 B.R. at 750; *Rusty Jones*, 110 B.R. at 373. The Court will focus the discussion in the matter at bar on those confirmation requirements that are disputed by the parties. All the other requirements of § 1129(a) have either been met or are inapplicable to the facts in this case and, accordingly, will not be discussed further.

One of the confirmation requirements in dispute involves § 1129(a)(11), which provides that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, . . . unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This requirement is commonly referred to as the "feasibility test." *See In re SM 104 Ltd.*, 160 B.R. 202, 234 (Bankr. S.D. Fla. 1993). Bankruptcy courts have an affirmative obligation to ensure that plans are feasible. *Repurchase Corp.*, 332 B.R. at 343 (*citing 203 N. LaSalle St.*, 126 F.3d at 962). The proponent need not demonstrate that a plan carries a guarantee of success. *Id.* Rather, a plan proposed by a proponent must "provide[] for a 'reasonable assurance of commercial viability.'" *Id.* The feasibility requirement mandates

-10-

that the plan proponent offer concrete evidence of sufficient cash flow to fund and maintain both

its operations and its obligations under the plan. *Coones v. Mut. Life Ins. Co. of N.Y.*, 168 B.R.

247, 255 (D. Wyo. 1994), *aff'd*, 56 F.3d 77 (10th Cir. 1995).

There is no prohibition on a long-term plan payment, as in the matter at bar. *See, e.g., In*

*re James Wilson Assocs.*, 965 F.2d 160 (7th Cir. 1992) (approving a seven-year balloon plan);

*SPCP Group, LLC v. Cypress Creek Assisted Living Residence, Inc.*, 434 B.R. 650 (M.D. Fla.

2010) (affirming confirmation of Chapter 11 plans where the secured creditor's claim was to be

paid in full with a 5.5% interest rate amortized over a twenty-year period with a balloon payment

due and payable in full in seventy-two months). The longer the term, however, the more doubtful

the projections and the more likely a court will be to deny confirmation. *See In re White*, 36 B.R.

199, 204 (Bankr. D. Kan. 1983); *see also In re 625 Corp.*, 228 B.R. 758, 761-62 (Bankr. M.D.

Fla. 1998) (finding a plan not feasible, where the evidence suggested that the debtor would have

difficulty making a lump sum balloon payment that was due at the end of the plan); *In re Mallard*

*Pond Ltd.*, 217 B.R. 782, 790 (Bankr. M.D. Tenn. 1997) (finding a fifty-nine year plan not

feasible in a case involving a 360-unit apartment complex, where an under-secured creditor's

claim was significant, the debtor failed to present evidence that it had ever generated sufficient

sums from operations to service the claim, and the debtor relied on speculative earnings in the

face of uncertain economic circumstances to make payments required under the plan); *In re*

*Agawam Creative Mktg. Assocs. Inc.*, 63 B.R. 612, 620-22 (Bankr. D. Mass. 1986) (finding thirty-

year plan not feasible, where the plan was to be funded out of operating revenues, the debtor did

not have a proven track record demonstrating profitable operations over even a five-year period,

-11-

and the debtor would have a cushion of only $672 during the first year of the plan, assuming its financial projections were accurate).

The feasibility requirement is problematic in the case at bar because the evidence undisputedly shows that the Debtor went into default on its pre-petition loans in 2008 and has not made any payments to the Lender on its claims since mortgage foreclosure proceedings were commenced in 2009. Payments to the Lender under the Plan do not commence until 2013. The amounts thereafter are not fixed, but are to be made from the full net operating income of the Debtor from the Property. Although the Plan assumes that there will be excess income over expenses in 2013 and thereafter, such amounts are unknown and uncertain and thus too speculative for the Court to conclude that payments are more likely to be made than not.

In addition, § 1129(a)(8) requires each class of claims or interests to accept the plan or not be impaired thereunder. *In re 4 C Solutions, Inc.*, 302 B.R. 592, 596 (Bankr. C.D. Ill. 2003). As the Class 2 and Class 3 claims holder, the Lender has voted to reject the Plan. Its claims against the Debtor matured pre-petition and remain unpaid. Thus, the claims are undisputedly impaired by the treatment in the Plan. Accordingly, § 1129(a)(8) has not been satisfied. Therefore, the Plan must comply with the requirements of § 1129(b) in order to be confirmed.

The Bankruptcy Code provides for confirmation of a proposed plan without the unanimous consent of all classes of creditors in a process known as "cram down." *See Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*, 547 F.3d 763, 768 (7th Cir. 2008). Section 1129(b) protects dissident classes. *In re Pullman Constr. Indus. Inc.*, 107 B.R. 909, 939 (Bankr. N.D. Ill. 1989). The relevant portion of § 1129(b) provides as follows:

-12-

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides–

(i)    (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. §§ 1129(b)(1) & (b)(2)(A).

There are two conditions that must be met in order for a plan to be crammed down under § 1129(b). *203 N. LaSalle St.*, 526 U.S. at 441; *Airadigm Commc'ns*, 547 F.3d at 768. First, each requirement of § 1129(a) must be established, except for acceptance of the plan by each impaired class of claims or interests under § 1129(a)(8). *Id.* Second, the objection of an impaired class may be overruled if the plan does not discriminate unfairly and is fair and equitable as to each

-13-

class of claims or interests that is impaired and has not accepted the plan. *Id.* In other words, a plan may be confirmed over the objection of an impaired creditor only if the creditor receives "fair and equitable" treatment. *In re Bloomingdale Partners*, 155 B.R. 961, 974 (Bankr. N.D. Ill. 1993).

A plan satisfies the "fair and equitable" requirement with respect to a secured claim if it fulfills clause (i), (ii), or (iii) of § 1129(b)(2)(A). *Airadigm Commc'ns*, 547 F.3d at 768; *In re Sparks*, 171 B.R. 860, 865 (Bankr. N.D. Ill. 1994). The three alternatives under which cram down is allowed with respect to secured creditors are: (i) retention of liens and receipt of payments equal to or exceeding the value of the creditor's interest in the property of the estate; (ii) imposition of liens on the proceeds from the sale of the collateral and receipt of payment equal to the value of such proceeds; or (iii) realization of the "indubitable equivalent" of the claims by their respective holders. 11 U.S.C. § 1129(b)(2)(A).

Here, the Plan does not specifically propose a sale of all or part of the Property. Further, there is no literal or figurative "pot of gold" indicated in the Plan that will give the Lender the "indubitable equivalent" of its $30,129,134 claim. The first alternative, however–retention of liens and receipt of payments equal to or exceeding the value of the Lender's interest in the Property–is proposed by the Plan. In fact, the dispute between the parties involves whether the proposed Plan payments are at least equal to the value of the Lender's interest in the Property. The Lender contends that the present value of the deferred cash payments does not equal the value of its secured claim.

According to the case law, however, the Debtor may rewrite the contract and extend the repayment period, thereby turning a short-term loan, like the one in the case at bar, into a long-

-14-

term obligation. *See* 6 Hon. William L. Norton, Jr. & William L. Norton III, *Norton Bankruptcy Law And Practice* § 113:12 at 113-33 nn.18 & 19 (3d ed. 2010) (collecting cases). The difficulty is not in mechanically computing a present value calculation and discounting deferred payments by a rate of return or interest factor to reflect the opportunity cost of capital. Rather, the difficulty lies in the selection of the appropriate discount rate. That rate is uncertain insomuch as the Code is silent about the determination of an appropriate figure, and the case law is anything but clear.

The Debtor argues that the Court should follow the lead of the plurality in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). The *Till* case involved a Chapter 13 bankruptcy, and the collateral at issue was a used car. There is no consensus among the lower courts as to whether *Till* applies to Chapter 11 cases. *See, e.g., In re Prussia Assocs.*, 322 B.R. 572, 585 (Bankr. E.D. Pa. 2005) (stating that *Till* is instructive, but not controlling as to mandating the use of the formula approach in every Chapter 11 case). By analogy, the *Till* reasoning is relatively easy to apply as the plurality endorsed the formula approach. *Till*, 541 U.S. at 478-79. The *Till* court found that this approach is best suited for determining the present value rate of interest where there is no readily determinable market rate of interest (or exit financing available to the debtor). *Till* rejected the coerced loan, presumptive contract rate, and cost of funds approaches. *Id.* at 477. According to the plurality, a formula approach that uses a national prime rate is the preferable method, in part, because such a rate is reported daily and is relatively easy for courts to determine. *Id.* at 478-79. Thus, the *Till* court concluded that the risk-free rate adjusted for risk of non-payment is appropriate. The formula approach is easy to apply in cases which a market rate for similar loans is not easily determinable. *See, e.g., Bank of Montreal v. Official Comm. of Unsecured Creditors (In re Am. HomePatient, Inc.)*, 420 F.3d 559, 568 (6th Cir. 2005) (finding

·-15-

that the market rate should be applied in Chapter 11 cases when an efficient market exists for the

debtor, but that, otherwise, the *Till* formula rate is appropriate); *SPCP Group*, 434 B.R. at 659-60

(finding that formal approach properly applied); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 255

(Bankr. M.D. Fla. 2006) (following *Am. HomePatient*).

A logical starting point in the matter at bar is for the Court to determine the value of the

Property for purposes of the Plan. The Debtor proposes to keep the Property and operate it in the

same manner and for the same purpose that it did pre-petition. The Debtor contends that the

Property should be valued at $8.9 million because that figure is consistent with the Lender's book

valuation of the Property and § 1129(b)(2)(A)(i)(II) requires this result. The Debtor argues that

because the Plan provides that the net rental income from the Property is to be paid to the Lender,

the Lender has "the advantage of ownership. . .without the passing of title." (Debtor Post-Trial

Brief pp. 6-7.)

The Lender counters that the Plan does not propose to pay it all net rental income because

of its claims against the Debtor. Rather, the Class 7 claim (the Affiliate's claim against the

Debtor for the draws that the Debtor made on its line of credit) is to be paid ahead of the Lender's

Class 2 and Class 3 claims. Thus, the Lender concludes that: (1) the treatment of its secured

claims is an attempt at conversion and subordination of its senior secured mortgage debt to virtual

equity status, under the logic of *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997);[2] (2)

$13.4 million is the appropriate value for the Property; and (3) the 3.25% prime interest rate is

---

[2] Under *Rash*, the United States Supreme Court used a secured creditor-friendly replacement value standard, rather than the lower foreclosure value standard, for valuing secured claims in a Chapter 13 cram down. The same value can be used in this matter, even though a Chapter 11 cram down plan is involved.

-16-

insufficient and inadequate to provide present value of the Debtor's projected net income under the Plan, which is overly optimistic in light of the Debtor's past performance with respect to the Property.

The Court concludes that the Lender has the better argument. The operative language of § 506(a)(1)'s last sentence provides that "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a)(1). At trial, the expert valuation witness opined that the Property was worth $8.9 million if operated by a for-profit entity. That figure is close to the foreclosure value. The expert also testified that the Property was worth $13.4 million if operated by a not-for-profit entity (like the Debtor). That figure is roughly the equivalent of replacement value. Because the Plan proposes that the Debtor retain and continue to operate the Property, the higher value should apply.[3] Accordingly, the Court concludes that the Property, which the Debtor proposes to retain, operate, and control, should be valued at $13.4 million for purposes of the Plan. The logic of *Rash* and the text from § 506(a)(1) quoted above militate in favor of using the higher figure to value the Property.

The Court rejects the Debtor's contention that the Lender's § 1111(b) election and its book entry value somehow mandate that the lower value be ascribed to the Property. Section § 1111(b) speaks to how the Lender's claims must be paid under the Plan; it does not specify how the

---

[3] Although not controlling here, § 506(a)(2) essentially codifies the result in *Rash*, directing courts to use replacement value for personal property in individual Chapter 7 and 13 cases. The statute clearly indicates Congressional intent favoring and mandating that standard for valuing such types of collateral in those cases.

-17-

Property is to be valued–§ 506(a) provides the standard for valuation. Section 1111(b)(2) simply provides that if an election is made, the Lender's claim is a secured claim to the extent that such claim is allowed, *see* 11 U.S.C. § 1111(b)(2), and the Lender will retain its lien on the Property even though the value of the collateral is less than the amount of its claim. The Plan's principal payments, either present or deferred, must be equal to the debt and of a present value equal to the value of the collateral. *See Bloomingdale Partners*, 155 B.R. at 974 (explaining that the § 1111(b) election entitles the secured creditor to have its entire claim treated as a secured claim for purposes of § 1129(b)). The Plan projections contemplate, and the Lender concedes, that over $45 million will be paid to the Lender at the end of the Plan term.

The parties dispute, however, that the present value of the payments equals or exceeds the $13.4 million value of the collateral. The present value of the payments is largely a function of the discount rate chosen. Thus, if the Debtor is to retain the Property under the Plan, a discount rate must be selected so that the Lender's claims will be paid in full with interest if the election is made. *See* 2 Thomas J. Salerno, Craig D. Hansen & G. Christopher Meyer, *Advanced Chapter 11 Bankruptcy Practice* § 10.70 at 170; §§ 11.30-34 (2d ed. 1997 & 2009 Supp.). Stated another way, § 1111(b) accords recourse status to a nonrecourse claim. In this way, the Lender retains its liens on the Property to the full extent of its allowed claims and must be treated under the Plan as a fully secured claimant with no unsecured deficiency or recourse claim.

Next, the Court turns to the adequacy of the Plan's 3.25% interest rate, which is equal to the national prime rate at the time of the hearing. Haggling over the appropriate discount rate to determine the present value of the proposed stream of payments under the Plan is a frustrating exercise. The Code fails to provide clear guidance or precise answers. Moreover, the evidence

-18-

adduced at trial regarding which discount rate should be applied was conflicting. Additionally, there was no testimony that the Debtor can obtain exit financing, and there does not appear to be a readily determinable market rate of interest. Thus, a simple and straightforward solution is to apply the formula approach espoused by the *Till* plurality.

The Debtor argues that the prime rate offered under the Plan provides for an adjustment of more than 15% over prime rate for the risk adjustment. The Court does not follow the Debtor's logic on this point. Moreover, the Debtor's argument that there is no heightened risk of nonperformance under the twenty-five year Plan because the Debtor is a not-for-profit, tax exempt entity ignores the undisputed facts that the Debtor went into default on the loans in 2008 and has paid nothing to the Lender since the foreclosure action was filed in 2009. Some risk adjustment upward per *Till* is necessary and the 3.25% rate is simply insufficient. The Court is not inclined to adjust the rate in light of the other objections to the Plan that the Court is sustaining. Whatever the appropriate rate, however, it must be more than the 3.25% currently provided for in the Plan. Further, despite holding the stipulated amounts of $322,714.25 in excess cash from post-petition rents and $204,466.51 from pre-petition rents, all of which are subject to the lien of the Lender's assignment of rents, the Debtor has not offered any adequate protection payments post-petition. The Debtor's failure to do so, coupled with the Plan deferral of any payments to the Lender on its Class 2 and Class 3 claims until 2013, is simply too little too late.

In sum, the preponderance of the credible evidence does not satisfy the Court that the feasibility requirement of § 1129(a)(11) and the cram down requirement of § 1129(b)(2)(A)(i)(II) have been met under the Plan. Underlying the premises of both *Rash* and *Till* is the fundamental notion that secured claims should be paid before unsecured claims. The Plan at bar does not do

-19-

that. Rather, it provides for preferred treatment of the Class 7 claim, a debt that the Affiliate owes to the Lender, which, in turn, the Debtor owes to the Affiliate. That the Affiliate separately owes that debt to the Lender does not obviate the Lender's objection to such treatment under the Plan. The Debtor, for the first time in its post-trial reply brief, offers to eliminate the favorable treatment afforded the Affiliate and the related entities relative to the Class 7 claim. Despite this "offer," the Debtor has not sought to amend the Plan in order to implement this major change to its terms.

The other primary objection raised by the Lender is based on the "fair and equitable" requirement of §§ 1129(b)(1) and (b)(2)(A) and speaks to the preferred treatment of the Affiliate under the Plan–the earlier payments made toward the Class 7 claim and the proposed injunctive and release provisions favoring the Affiliate and other related entities relative to the Cloister Courts mortgage. The record is devoid of any evidence that the Affiliate or any related entity is making a substantial contribution to the reorganization of the Debtor or that release is essential to the reorganization. As noted *supra*, payment of the Class 7 claim does not satisfy an obligation that the Debtor owes the Lender. The net rents being used to pay the Class 7 claim are presently part of the Lender's cash collateral. The effect of paying the Class 7 claim before the Lender's Class 2 and Class 3 claims is to subordinate the Lender's claims. Thus, the Court finds that the Plan's treatment of the Lender's claims violates the "fair and equitable" requirement of §§ 1129(b)(1) and (b)(2)(A).

Moreover, the attendant injunctive and release provisions certainly favor the Affiliate and other related entities, although the Affiliate does not contribute anything to the Debtor's reorganization. The Affiliate allowed its line of credit to be used by the Debtor to complete the

-20-

Property's improvements several years pre-petition, but the release in favor of the Affiliate and other related entities has not been shown to be "essential to the reorganization" of the Debtor. *See Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*, 519 F.3d 640, 657 (7th Cir. 2008). Because neither the Affiliate nor any related entity or other obligor on notes or other obligations held by the Lender are in bankruptcy, release of any potential avoidance actions by one or more of them under the Plan is illusory at best. Accordingly, the Court finds that the injunctive and release provisions also violate the "fair and equitable" requirement of the statute.

In addition, the Plan allows the Debtor to sell portions of the Property at its discretion post-confirmation without the consent of the Lender. The Court finds that this provision violates § 1129(b)(2)(A)(ii), which requires any sale of property against which a lender holds secured liens to be subject to that lender's rights to credit bid against the sale price pursuant to § 363(k). Because the Lender's claims in this matter are allowed and undisputed, the Court has not been shown cause to order otherwise and deprive the Lender of its credit bid rights under § 363(k) and § 1129(b)(2)(A)(ii). A debtor may not circumvent an under-secured creditor's § 1111(b) rights by proposing a plan that calls for the sale of encumbered property "'at some unspecified future time, to some unspecified purchaser, at an unspecified price and on unspecified terms.'" *H & M Parmely Farms v. Farmers Home Admin.*, 127 B.R. 644, 649 (D.S.D. 1990) (*quoting In re W. Real Estate Fund, Inc.*, 75 B.R. 580, 589 (Bankr. W.D. Okla. 1987)). The Court finds that the Plan does not provide the Lender the "indubitable equivalent" of its interest in the Property. The case of *In re Philadelphia Newspapers, LLC*, 599 F.3d 298 (3d Cir. 2010), on which the Debtor relies, is inapposite. That case involved a plan to sell all of the debtors' assets with a "stalking horse" bidder in place, a scenario which is completely different from the one in this matter.

-21-

In sum, the Court denies confirmation of the Debtor's Plan and sustains in part the objections of the Lender.

**B.      Motion to Lift the Automatic Stay**

The final point to address is the Lender's motion to lift the automatic stay under §§ 362(d)(2) and (d)(3). The automatic stay under § 362(a) was enacted "'to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.'" *In re Pleasant*, 320 B.R. 889, 893 (Bankr. N.D. Ill. 2004) (*quoting Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del. 1992)). Sections 362(d)(2) and (d)(3) of the Bankruptcy Code provide for relief from the automatic stay and state in pertinent part as follows:

> (d)  On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–
>
> .   .   .
>
> (2)  with respect to a stay of an act against property under subsection (a) of this section, if–
> > (A)  the debtor does not have an equity in such property; and
> > (B)  such property is not necessary to an effective reorganization;
> (3)  with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later–
> > (A)  the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or
> > (B)  the debtor has commenced monthly payments that–

-22-

> (i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and
>
> (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate[.]

11 U.S.C. §§ 362(d)(2) & (d)(3).

The decision to modify the automatic stay pursuant to § 362(d) is committed to the sound discretion of the bankruptcy court. *In re C & S Grain Co.*, 47 F.3d 233, 238 (7th Cir. 1995); *In re Boomgarden*, 780 F.2d 657, 660 (7th Cir. 1985); *Holtkamp v. Littlefield (In re Holtkamp)*, 669 F.2d 505, 507 (7th Cir. 1982).

Section 362(d)(2) allows relief in the event that no equity exists in the property, and the property is not necessary to an effective reorganization. As the party requesting relief from the stay, the Lender bears the burden on the issue of the Debtor's equity in the Property. *See* 11 U.S.C. § 362(g)(1); *see also Fed. Nat'l Mortg. Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship*, 153 B.R. 204, 208 (N.D. Ill. 1993); *In re Standfield*, 152 B.R. 528, 534 (Bankr. N.D. Ill. 1993). The Debtor, opposing such relief, has the burden of proof on all other issues. *See* 11 U.S.C. § 362(g)(2); *see also Fed. Nat'l Mortg.*, 153 B.R. at 208; *Standfield*, 152 B.R. at 534. The Debtor must establish that the Property is "necessary to an effective reorganization." *See* 11 U.S.C. § 362(d)(2)(B). In order to demonstrate this element, the Debtor must show that there is "a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n*

-23-

*of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-76 (1988) (internal quotation

omitted).

Section 362(d)(3) allows the debtor to defeat a motion to lift the stay if the debtor has filed

a plan that has "a reasonable possibility of being confirmed within a reasonable period of time,"

§ 362(d)(3)(A), and the debtor has commenced monthly interest payments to the secured creditor,

§ 362(d)(3)(B). "[T]he standard for interpreting § 362(d)(3)(A) is nearly identical to the standard

for determining whether or not property is 'necessary for an effective reorganization' in §

362(d)(2)(B)." *In re Windwood Heights, Inc.*, 385 B.R. 832, 837-38 (Bankr. N.D. W.Va. 2008).

First, the Court will address the Lender's request for relief from the stay under § 362(d)(2).

It is undisputed that the requirement of § 362(d)(2)(A) is met as the parties stipulated that the

Debtor has no equity in the Property.  Moreover, the Property is obviously necessary to the

Debtor's reorganization.  Nevertheless, the Plan cannot be confirmed for the reasons previously

articulated.  Thus, there is no reasonable possibility of a successful reorganization.  Accordingly,

stay relief is warranted under § 362(d)(2).

Next, the Court turns to the Lender's relief pursuant to § 362(d)(3).  It is undisputed that

the Debtor has not made any payments to the Lender since the bankruptcy petition was filed.  The

Debtor is operating the Property as "single asset real estate" as defined in 11 U.S.C. § 101(51B).[4]

---

[4] Section 101(51B) provides as follows:

> The term "single asset real estate" means real property
> constituting a single property or project, other than residential
> real property with fewer than 4 residential units, which
> generates substantially all of the gross income of a debtor who

-24-

The Property generates substantially all of the Debtor's gross income and its operations, as discussed *supra*, are the only business conducted thereon with the related services incidental thereto. The Debtor has not commenced monthly payments from the rents collected from the Property in an amount equal to the applicable non-default contract rate of interest on the value of the Lender's interest in the Property. Hence, relief from the stay is also appropriate under § 362(d)(3)(B).

## IV.  CONCLUSION

For the foregoing reasons, the Court sustains in part the Lender's objections and denies confirmation of the Plan. In addition, the Lender's motion for relief from the automatic stay under §§ 362(d)(2) and (d)(3)(B) is granted.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rules of Bankruptcy Procedure 5003 and 9021.

**ENTERED:**

DATE: ___12/7/10___          John H. Squires
                             **John H. Squires**
                             **United States Bankruptcy Judge**

cc:     See attached Service List

---

is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental.

11 U.S.C. § 101(51B).

## SERVICE LIST

### Mayslake Village - Plainfield Campus, Inc., an Illinois not-for-profit corporation
### Bankruptcy Case No. 09 B 43338

Daniel A. Zazove, Esq.
Kathleen A. Stetsko, Esq.
Perkins Coie LLP
131 S. Dearborn Street, Suite 1700
Chicago, IL 60603

Steven B. Towbin, Esq.
Shaw Gussis Fishman Glantz Wolfson et al.
321 N. Clark Street, Suite 800
Chicago, IL 60610

William Barrett, Esq.
Kimberly J. Robinson, Esq.
Barack Ferrazzano Kirschbaum & Nagleberg
LLP
200 W. Madison Street, Suite 3900
Chicago, IL 60654

Judy B. Calton, Esq.
Honigman Miller Schwartz and Cohn LLP
660 Woodward Avenue, Suite 2290
Detroit, MI 48226

William T. Neary, United States Trustee
219 S. Dearborn Street
Suite 873
Chicago, IL 60604

Janice A. Alwin, Esq.
Oak Point Partners
1540 E. Dundee Road, Suite 240
Palatine, IL 60074

George R. Mesires, Esq.
Ungaretti & Harris LLP
Three First National Plaza
70 W. Madison Street, Suite 3500
Chicago, IL 60602